## RONALD M. HEDBERG *v.* PANTEPEC INTERNATIONAL, INC.
### (12253)

O'CONNELL, FOTI and FREEDMAN, Js.

Argued March 21—decision released July 5, 1994

*L. Page Heslin,* with whom, on the brief, were *Mark R. Carta* and *Mary E. Schifferli,* for the appellant (plaintiff).

*Richard J. Buturla,* for the appellee (defendant).

FREEDMAN, J. The plaintiff, Ronald M. Hedberg, appeals from the judgment of the trial court rendered in favor of the defendant, Pantepec International, Inc. (Pantepec). On appeal, Hedberg claims that the trial court improperly (1) failed to apply the "business judgment rule" to the board of directors' decision approving his written employment agreement because (a) the board's adoption of the written employment agreement was not a defensive mechanism and (b), in applying the test set forth in *Unocal Corp.* v. *Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985), the trial court improperly found that the written employment agreement was not a reasonable response to the perceived threat to Pantepec, and (2) failed to find that Pantepec violated the Connecticut Unfair Trade Practices Act; General Statutes § 42-110a et seq.; by refusing to honor Hedberg's agreement. We reverse the judgment of the trial court.

The trial court found the following facts. The parties agreed that their claims are governed by Delaware law. Pantepec, a Delaware corporation publicly traded on the Boston stock exchange, is an investment company engaged in exploring and investigating oil and gas properties. Hedberg, who holds a doctorate in petroleum geology, worked as a consultant for Pantepec for several years before being elevated, in February, 1985,[1] to serve as president and director. Shortly after Hedberg became president, he and Pantepec entered into an agreement setting forth the terms of Hedberg's employment. The terms were summarized in a letter dated March 25, 1985. There was no provision for any fixed term of employment, no restriction

[1] The trial court's memorandum of decision gives 1987 as the date of Hedberg's promotion to president and director. Our review of the exhibits, however, makes it clear that it was 1985. This appears to be simply a typographical error.

on termination for good cause, nor any safeguards for Hedberg's benefit in the event of a change of control of Pantepec.

On November 6, 1985, the board of directors voted to increase Hedberg's compensation from $30,000 per year for which he devoted one third of his time to $60,000 per year for which he would devote two thirds of his time. The rest of his benefits remained the same as described in the March 25, 1985 letter. In 1987, Pantepec's board of directors consisted of Hedberg, Harold Hansen, and Frederick Hemming. Soon thereafter, Pantepec hired Rudolph Bremser as corporate treasurer and vice-president. Bremser was not a party to a written employment contract. From 1987 to the time of trial, Pantepec never had more than two employees, Hedberg and Bremser.

Between 1987 and 1989 Pantepec actively tried to locate merger partners. In February, 1989, Robert A. Levinson, a New York investor with an expertise in the textile industry, approached Pantepec and advised the board of directors that he felt that it was not to Pantepec's benefit to continue to limit Pantepec's activities to oil and gas investments and that they should turn control over to him. Levinson presented no particular plans for the future of Pantepec, and the directors were concerned that if he took over the company he did not have the requisite expertise to obtain fair value for Pantepec's oil and gas investments. The directors refused, and Levinson put up a slate of his own directors and solicited proxy votes from the shareholders. Immediately thereafter, both Hedberg and Bremser met with Pantepec's attorney and relayed Levinson's ultimatum. The attorney inquired into whether either Hedberg or Bremser had written employment agreements.

On May 22, 1989, while proxies were being received, the board of directors held a telephone meeting to dis-

cuss, inter alia, drafts of employment agreements for Hedberg and Bremser. The drafts had been mailed to each director prior to the meeting. All three directors approved Bremser's agreement and, with Hedberg abstaining, the other two directors approved Hedberg's agreement. Hedberg's agreement, governing his employment with Pantepec for twenty-four months, limited Pantepec's right to terminate Hedberg to "good cause," allowed Hedberg to terminate his services under certain conditions, and, in the case of his termination by Pantepec for other than good cause, allowed for severance pay and continuation of benefits for either twelve months or for the remainder of the term of his agreement, whichever is greater. Hedberg signed his employment agreement the following day.

On May 24, 1989, at Pantepec's annual meeting, the shareholders voted on the incumbent slate and Levinson's slate. The vote was so close that the meeting was continued for a recount. On June 15, 1989, the board announced that Levinson's slate had won. On that same day, Levinson asked Hedberg to sign an agreement abrogating his employment agreement. Hedberg refused. Levinson made statements to the effect that unless Hedberg signed the abrogation agreement, he would no longer be employed in any capacity. On June 16, 1989, Levinson advised Hedberg by letter that he did not believe Hedberg's employment agreement was valid, and further, that its terms constituted a breach of the former board of directors' fiduciary duties to Pantepec.

Hedberg continued to perform services for Pantepec until June 29, 1989, when Levinson notified Hedberg, by letter, that his employment was terminated. Pantepec did not pay Hedberg the severance pay or any of the other benefits set forth in his employment agreement.

Hedberg filed suit against Pantepec for breach of his employment agreement. The trial court found that Hedberg's employment agreement was a defensive mechanism, entered into in reaction to the proxy contest, and that it was not entitled to the deference of the "business judgment rule" because Hedberg had failed to meet his burden under the second prong of the test set forth in *Unocal Corp.* v. *Mesa Petroleum Co.,* supra, 493 A.2d 955. Because the employment agreement was an unreasonable response to the perceived threat, it was invalid and voidable; thus, Hedberg could not prevail on his claim.

I

Hedberg claims that the trial court improperly failed to apply the "business judgment rule" to the board of directors' decision approving his written employment contract. We agree.

"Under Delaware law the business and affairs of a corporation are managed by and under the direction of its board of directors. See 8 Del. C. § 141 (a). In performing their duties the directors owe fundamental fiduciary duties of loyalty and care to the corporation and its shareholders. *Guth* v. *Loft, Inc.,* 5 A.2d 503, 510 (Del. 1939); *Aronson* v. *Lewis,* 473 A.2d 805, 811 (Del. 1984). Subject to certain well defined limitations, a board enjoys the protection of the business judgment rule discharging its responsibilities. The rule creates a presumption 'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation.' *Aronson* v. *Lewis,* [supra] 812." *Polk* v. *Good,* 507 A.2d 531, 536 (Del. 1986).

"The business judgment rule is available to directors even where they are responding to a takeover threat. In those circumstances, however, there is an

'omnipresent specter that a board may be acting primarily in its own interest. . . .' *Unocal Corporation v. Mesa Petroleum Co.,* [supra, 493 A.2d 954]. As a result, before the business judgment rule will be applied in this context, the directors must establish 'reasonable grounds for believing that a danger to corporate policy and effectiveness existed' and the defensive measure chosen by the board must be 'reasonable in relation to the threat posed.' Id., 955." *Shamrock Holdings, Inc. v. Polaroid Corp.,* 559 A.2d 257, 269–70 (Del. Ch. 1989). This is the *Unocal* test.

"Once the directors make the above showings, the burden shifts back to the defendants who have the ultimate burden of persuasion to show a breach of the directors' fiduciary duties. [*Unocal Corp. v. Mesa Petroleum Co.,* supra, 493 A.2d 958]; *Moran v. Household Intern, Inc.,* 500 A.2d 1346, 1356 (Del. 1985)." *Buckhorn, Inc. v. Ropak Corp.,* 656 F. Sup. 209, 227 (S.D. Ohio), aff'd without opinion, 815 F.2d 76 (6th Cir. 1987).

## A

Hedberg argues that the board's adoption of the written employment agreement was not a defensive mechanism taken in response to a takeover threat. The trial court, therefore, should not have reviewed its adoption under the *Unocal* test, but, rather, should have applied the business judgment rule in reviewing the board's adoption of the agreement and presumed that the actions of the board were taken for the benefit of the corporation. We are not persuaded.

Hedberg argues that because the board's decision to approve the written employment agreements was considered prior to Levinson's notice to Pantepec of his interest in the corporation, it was not a defensive mechanism. Hedberg refers us to *Buckhorn, Inc. v. Ropak Corp.,* supra, 656 F. Sup. 209, for support. In *Buckhorn,* the federal District Court reviewed particular

amendments to the employment contract of an executive under the "business judgment rule" despite the fact they were made after a specific takeover threat to the company. Id., 215–18, 233–34. The court stated: "Whereas the evidence clearly demonstrates that these measures were contemplated by the directors prior to the tender offer and were unrelated to change of control, the Court believes that it is appropriate to apply the traditional business judgment rule." Id., 234.

Here, the trial court found "that the employment agreement at issue was unmistakably a defensive mechanism, entered into in reaction to the proxy contest." In making this finding, the trial court relied on the testimony of Hansen, one of the two directors who approved Hedberg's employment agreement, who testified that the purpose of the employment agreement was to protect the shareholders by assuring that there would be a knowledgeable person in charge in case of a change of directors.

The determination of this question is purely a question of fact. Both Delaware law and Connecticut law are clear that only if the trial court's findings of fact are clearly erroneous will we reverse the trial court's judgment.[2] See *Marine* v. *State,* 624 A.2d 1181, 1190 (Del. 1993), citing *Levitt* v. *Bouvier,* 287 A.2d 671, 673 (Del. 1972); see also *Ballato* v. *Board of Education,* 33 Conn. App. 78, 89–90, 633 A.2d 323 (1993), cert. denied, 228 Conn. 923, 638 A.2d 37 (1994). In light of Hansen's testimony, we cannot conclude that the trial court's finding, that the written employment agreement was a defensive mechanism, was clearly erroneous.

[2] We need not address whether the standard of review is a procedural or a substantive issue and thereby determine which state's standard applies. Under both states' law, a question of fact is reviewed under the clearly erroneous standard. Compare *Ballato* v. *Board of Education,* 33 Conn. App. 78, 89–90, 633 A.2d 323 (1993), cert. denied, 228 Conn. 923, 638 A.2d 37 (1994), with *Marine* v. *State,* 624 A.2d 1181, 1190 (Del. 1993), citing *Levitt* v. *Bouvier,* 287 A.2d 671, 673 (Del. 1972).

The trial court, therefore, properly found that the adoption of the written employment agreement was a defensive mechanism and, therefore, properly reviewed its adoption under the *Unocal* test.

## B

Hedberg also argues that under *Unocal*, the trial court improperly found that the written employment agreement was not a reasonable response to the perceived threat to Pantepec. Specifically, he claims that the trial court incorrectly interpreted the agreement as permitting Hedberg to terminate the agreement and his services immediately upon a change of control of Pantepec.

With respect to the first prong of the *Unocal* test, the trial court found that Pantepec's directors felt the Levinson proxy challenge was a danger. Prior to the challenge, Pantepec had been engaged exclusively in oil and gas investments. In addition, it was a small company with only one employee, Hedberg, having any ongoing knowledge of its substantive business. If Hedberg were summarily fired, it was reasonable to believe that Pantepec would suffer. Further, Levinson had not outlined his plans for the company other than to indicate that it should get out of oil and gas investments. Such plans suggest that Levinson would rapidly dispose of the company's related assets. Thus, the trial court found that Hedberg had met the first prong of the *Unocal* test, in that the board of directors had reasonable grounds for believing that Levinson's proxy challenge posed a threat to Pantepec.

In addressing the second prong of *Unocal*, the trial court acknowledged that, although a board of directors enters into obligations with an employee as a defensive mechanism potentially affecting the options of subsequent boards, that does not in and of itself make the obligations unfair. *Shamrock Holdings, Inc.* v. *Polar-*

*oid Corp.,* supra, 559 A.2d 276. It also agreed that, as long as the defensive mechanism benefits the corporation and is fair, it is valid. Id. Nonetheless, the trial court found that Hedberg had failed to meet the second prong because the written employment contract was not reasonable in relation to the threat posed by Levinson.

The trial court, in making this determination, relied on the language of the employment agreement itself. The trial court found that, according to the terms of the agreement, "if the pending proxy contest resulted in the election of Levinson's board, Hedberg was not obligated to provide services other than for a one month period after giving notice, and the corporation was obligated to pay severance pay for up to twenty-three months. Since the terms of the agreement entitled Hedberg to the same compensation and benefits for twenty-three months whether or not he chose to continue to work for Pantepec, the agreement was not reasonably calculated to achieve the continuity that director Hansen testified was the reason for its creation. Instead, the agreement protected Hedberg, an officer and director, at the expense of the corporation without even attempting to secure the stated advantage of continuity and expertise for the company."

In Delaware, "[t]he correct interpretation of language in a contract, although 'analytically a question of fact, is treated as a question of law both in the trial court and on appeal.' *Klair* v. *Reese,* 531 A.2d 219, 222 (Del. 1987) [citing, 1 Restatement (Second), Contracts § 212, comment d (1981); 4 W. Jaeger, Williston on Contracts § 616 (3d Ed. 1961)]." *Watkins* v. *Beatrice Co.,* 560 A.2d 1016, 1021 (Del. 1989). "An appellate court will make its own interpretation of the contractual language, since it is in as good a position as the trial court to do so. . . . If the interpretation of the trial court rests not on its reading of the agreement

but on findings of fact concerning evidence beyond the four corners of the contract ('extrinsic evidence') or on inferences drawn from those findings, the appellate court will defer to the trial court's interpretation unless the findings are not supported by the record or the inferences and deductions are either not supported by the record or not the product of an orderly or logical deductive reasoning process." (Citations omitted.) *Klair* v. *Reese,* supra, 222. In Connecticut, while the interpretation of a contract is generally a question of fact, when the language of a contract is capable of only one interpretation the court need not look outside the four corners of the contract or make any findings of fact and, therefore, the interpretation of the contract involves only questions of law. *Gurliacci* v. *Mayer,* 218 Conn. 531, 567, 590 A.2d 914 (1991); *Bowman* v. *1477 Central Avenue Apartments, Inc.,* 203 Conn. 246, 257, 524 A.2d 610 (1987). Because, in both Delaware and Connecticut, the interpretation of a contract not involving any findings of fact is treated as a question of law, we need not address whether the standard of review is a procedural or a substantive issue in order to determine which state's standard applies.

Our review of the language of the contract does not support the trial court's findings.[3] Nowhere does the

---

[3] The relevant language of the agreement provides: "<u>Termination by Employee</u>. Employee may terminate his employment hereunder upon thirty (30) days' prior written notice to Company for Good Reason. For the purposes of this Agreement, 'Good Reason' shall mean (A) any removal of Employee from, or any failure to re-elect Employee to, his position as President and Secretary, except in connection with termination of Employee's employment for cause, (B) failure by Company to comply with Section 3 hereof in any material respect, or (C) failure of Company to obtain the assumption of this Agreement by any successor as contemplated in Section 9 hereof.

"In case of a 'change of control' (as hereinafter defined) of Company, 'Good Reason' shall also mean:

"(i) an adverse change in Employee's status or position(s) as an executive officer of Company as in effect immediately prior to the change in con-

agreement provide that Hedberg may terminate his employment and receive severance pay and benefits simply on the change of control of Pantepec. The agreement provides that Hedberg may terminate his employment for "good reason." The agreement then defines

trol, or the assignment to Employee of any duties or responsibilities which, in Employee's reasonable judgment, are inconsistent with such status or position(s), or any removal of Employee from, or any failure to reappoint or reelect Employee to, such position(s) (except in connection with the termination of employment for cause or disability or as a result of Employee's death or by Employee other than for Good Reason);

"(ii) a reduction by Company in Employee's base compensation as in effect immediately prior to the change in control;

"(iii) the failure by Company to continue in effect any Plan (as hereinafter defined) in which Employee is participating at the time of the change in control of Company (or Plans providing Employee with at least substantially similar benefits) other than as a result of the normal expiration of any such Plan in accordance with its terms as in effect at the time of the change in control, or the taking of any action, or the failure to act, by Company which would adversely affect Employees' continued participation in any of such Plans on at least as favorable a basis to Employee as is the case on the date of the change in control or which would materially reduce Employee's benefits in the future under any of such Plans or deprive Employee of any material benefit enjoyed at the time of the change in control. 'Plan' shall mean any compensation plan such as an incentive, stock option or restricted stock plan or any employee benefit plan such as a thrift, pension, profit sharing, medical, disability, accident, life insurance plan or a relocation plan or policy or any other plan, program or policy of Company intended to benefit employees;

"(iv) the failure by Company to provide and credit Employee with the number of paid vacation days to which Employee is then entitled hereunder immediately prior to the change in control;

"(v) Company's requiring Employee to be based anywhere other than where Employee's office is located immediately prior to the change in control except for required travel on Company's business to an extent substantially consistent with the business travel obligations undertaken on behalf of Company prior to the change in control;

"(vi) any purported termination by Company of Employee's employment which is not effected pursuant to a Notice of Termination satisfying the requirements of this Section 5 and Section 8 of this Agreement; or

"(vii) any refusal by Company to continue to allow Employee to attend to matters or engage in activities not directly related to the business of Company which, prior to the change in control, Employee was permitted by the Board to attend to or engage in."

what good reason includes. In the case of a change of control of the company, there is good reason for termination in seven different situations. Each requires an affirmative action by the company, after the change in control, that adversely impacts Hedberg's compensation or responsibilities. Only then would Hedberg have good reason to terminate his employment and to collect severance pay and benefits.

We conclude that the trial court's finding that the written agreement allowed Hedberg to terminate the agreement on a change of control was improper. Because we conclude that the trial court found that the written employment agreement was an unreasonable response to the threatened takeover, based on an improper interpretation of the language of the contract, we reverse the judgment of the trial court and remand this matter for a new trial.

## II

Hedberg's final claim is that the trial court improperly failed to find that Pantepec violated the Connecticut Unfair Trade Practices Act by refusing to honor Hedberg's written employment agreement. Since this issue was not addressed by the trial court and, in light of our disposition of the first issue in this matter, we need not address this issue at this time.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.