VENTURE PARTNERS, LTD. *v.* SYNAPSE
TECHNOLOGIES, INC., ET AL.
(13683)

Dupont, C. J., and Hennessy and Spallone, Js.

Argued December 8, 1995—officially released July 9, 1996

*Theodore R. Killiam,* for the appellants (defendants).

*Leslee B. Hill,* with whom, on the brief, was *Robert A. Ziegler,* for the appellee (plaintiff).

SPALLONE, J. The defendants, Synapse Technologies, Inc., and its chief executive officer, Floyd Wallace III, (hereinafter referred to jointly as the defendant) having been found liable to the plaintiff pursuant to a contract between the parties, appeal from the judgment of the trial court rendered by a state trial referee. On appeal, the defendant claims that the trial court improperly (1) interpreted the allegedly unambiguous language of the contract, and (2) found an, ambiguity in the contract and resolved that ambiguity in favor of the plaintiff.

The record reveals the following facts. The plaintiff is a midsized company that advises and assists other businesses in strategic and financial planning. Its services include locating new capital to be invested in its clients' businesses. On August 7, 1991, the defendant entered into a contract with the plaintiff.[1] Under the contract, the plaintiff was to provide various financial

---

[1] The contract, after its amendment on March 7, 1992, provided in pertinent part: "Engagement Letter. This letter sets forth the agreement between Floyd Wallace, III or any entity he might establish for the acquisition of all or part of Middleburg Corporation (collectively 'FWIII') and Venture Partners, Ltd. ('VP') with respect to, among other things, the furnishing by VP to FWIII of certain consulting services relating to financial advisory services, the review and formulation of a business plan/financing memorandum, and the arrangement, on a best efforts basis, of equity and/or debt financing, a stategic partnering relationship, or a sale or merger.

1. Overview of Services

Subject to the terms and conditions set forth herein, VP will endeavor to: i) Provide consulting services in helping to formulate and review long term stategy, financing needs, and structure. ii) Assist in the formulation of a comprehensive business plan/financing memorandum. iii) Arrange for meetings and other communications between FWIII and select number of private and institutional lenders/investors. iv) Assist in various negotiations as required by FWIII. . . .

2. Stategy Development and Financial Advisory Services

VP will assist FWIII in exploring alternative stategies, evaluating the potential structure and developing an estimate of the resources required . . . to implement the plan. VP will then assist FWIII, as required, in developing a focused, consistent strategy for attacking the potential market opportunities, assist the Company in the formulation of a financing memorandum for

consulting services to the defendant, including assistance in formulating a comprehensive business plan-financing memorandum. In addition, the plaintiff was to aid the defendant in identifying and negotiating with potential investors. The parties agree that a goal of the agreement was to enable the defendant to acquire the assets of Middleburg Corporation (Middleburg). The contract called for the plaintiff to receive three forms of compensation: (1) a monthly retainer of $2500, under part two of the contract; (2) a percentage of the funding obtained by the plaintiff on behalf of the defendant that was payable "[u]pon the consummation of the funding (the 'closing')," under part four, paragraph one; and (3) the right to purchase at closing, warrants to purchase a percentage of the defendant's founder's stock at a nominal price, under part four, paragraph two.

articulating the opportunity to the investment community, and work with the Company in identifying investment sources and arranging financing. As compensation for this effort, FWIII will pay to VP a monthly nonrefundable retainer of Two Thousand Five Hundred Dollars . . . . VP agrees to accrue such retainers for a period of one hundred twenty (120) days, or until the closing, whichever occurs first. . . .

4. Arrangement of financing

VP will use its best efforts to obtain the funding in an amount necessary to finance the plans outlined in the financing memorandum. Upon the consummation of the funding (the 'closing'), FWIII shall pay to VP a fee in cash equal to five and one half percent (5.5%) of the gross proceeds of the funding up to one million dollars; four percent (4%) of the gross proceeds of the funding between one million and two million dollars; three percent (3%) of the gross proceeds of the funding between two million and three million dollars; two percent (2%) of the gross proceeds of the funding exceeding three million dollars. FWIII, in his sole discretion, may accept or reject any offers of funding.

Additionally, FWIII grants to VP the right to purchase at closing, for a nominal price of $100, warrants to purchase an amount of securities equal to . . . 15% of FWIII's founders stock at an exercise price per unit equal to five cents per share ($0.05), exercisable at any time within seven years (7) from the closing of this transaction and having normal antidilution clauses. . . . Plus warrants to purchase an additional three percent (3%) of outstanding shares at the closing of third party investment at an [execise] price per unit equal to the purchase or valuation price per unit of stock sold as part of this transaction."

Although Middleburg owned a potentially valuable technology patent, it also had three liabilites. First, another company, Teradyne, had an interest in the patent that Middleburg owned. Second, Connecticut Innovations, Inc. (Connecticut Innovations), was a secured creditor in the amount of approximately $600,000. Third, the Bank of Boston, in conjunction with the Small Business Administration (jointly referred to as SBA), was a secured creditor in the amount of $300,000.

The plaintiff and the defendant agreed that reducing the size of Middleburg's debts to Connecticut Innovations and the SBA was essential if the defendant was to acquire Middleburg's assets and to attract new capital. Largely through the plaintiff's efforts, Connecticut Innovations agreed to foreclose on Middleburg's assets, including its right in the technology patent. Connecticut Innovations then sold the assets to the defendant in a private secured party sale for $220,000 on March 11, 1992. Connecticut Innovations maintained a royalty right in the technology and the defendant signed a promissory note for the entire amount. Several days prior to this transaction, the plaintiff and the defendant agreed to modify the portion of the contract that applied to the third form of compensation. Instead of the original percentage, the defendant granted the plaintiff warrants to purchase 15 percent of the founder's stock as well as warrants to purchase an additional 3 percent of the outstanding shares of the defendant, all of which were due at the closing.

Following this transaction with Connecticut Innovations, which is the gravamen of the present case, the plaintiff continued to work on behalf of the defendant to reduce or eliminate the two other liabilities. Finally, on November 4, 1992, the defendant acquired SBA's rights in Middleburg's assets and it settled with Teradyne that company's right in the technology patent.

At trial, the plaintiff claimed that the transaction between the defendant and Connecticut Innovations, in which the defendant acquired Middleburg's assets, constituted the closing called for in the contract. Therefore, the plaintiff sought the amount due in fees as well as the warrants to purchase 15 percent of the stock of the defendant Synapse Technologies. The defendant, while conceding the importance of the Connecticut Innovations transaction, contended that the closing actually was to be the consummation of funding from other outside investors. The trial court, after rejecting the defendant's four special defenses and its three counterclaims, agreed with the plaintiff. The trial court awarded to the plaintiff $45,518.75 for unpaid fees, reasonable attorney's fees, and required the defendant to provide to the plaintiff the warrants for the purchase of 15 percent of the founder's stock. We disagree with the trial court's interpretation of the contract.

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Citations omitted; internal quotation marks omitted.) *Levine* v. *Massey*, 232 Conn. 272, 277–78, 654 A.2d 737 (1995). "In such a situation our scope of review is plenary, and is not limited by the clearly erroneous standard." (Internal quotation marks omitted.) *De Leonardis* v. *Subway Sandwich Shops, Inc.*, 35 Conn. App. 353, 357, 646 A.2d 230, cert. denied, 231 Conn. 925, 648 A.2d 162 (1994). When only one interpretation of a contract is possible, "the court need not look outside the four corners of the contract . . . ." *Hedberg* v. *Pantepec International, Inc.*, 35 Conn. App. 19, 28, 645 A.2d 543, cert. granted on other grounds, 231 Conn. 927, 648 A.2d 879 (1994) (appeal withdrawn February 21, 1995); see *Levine* v. *Massey*, supra, 278 n.7. In addi-

tion, "[t]he circumstances surrounding the making of the contract, the purposes which the parties sought to accomplish and their motives cannot prove an intent contrary to the plain meaning of the language used." *Levine* v. *Massey*, supra, 279, citing *Connecticut Co.* v. *Division 425*, 147 Conn. 608, 616–17, 164 A.2d 413 (1960). Finally, "[t]he court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." (Internal quotation marks omitted.) *Levine* v. *Massey*, supra, 279. We conclude that the language of the contract between the plaintiff and the defendant is not ambiguous. Therefore, its proper interpretation is a matter of law.

As an initial matter, we disagree with the trial court's interpretation of language in the introductory paragraph of the contract. The trial court, in its memorandum of decision, stated that "[t]he agreement in the introductory paragraph sets out as the basic purpose of the agreement the type of services to be provided by the plaintiff to the defendant relating to '. . . *the acquisition of all or part of Middleburg Corporation . . . .*'" (Emphasis added.) Reading the italicized portion in a larger context, however, clearly reveals that the language merely defines the parties to the contract. The introductory paragraph begins: "This letter sets forth the agreement between Floyd Wallace, III or any entity he might establish for the acquisition of all or part of Middleburg Corporation . . . . and Venture Partners, Ltd. . . . with respect to . . . ." Only after first defining the parties does the introductory paragraph specify the purposes of the contract. These purposes are indicated by the phrase "with respect to." The services listed are nearly identical to those listed in part one of the contract entitled "Overview of Services." Thus, the introductory paragraph does not assist us in our interpretation of the term "closing."

We also note that our interpretation of the introductory paragraph conforms with "[t]he circumstances surrounding the making of the contract . . . ." (Internal quotation marks omitted.) *Levine* v. *Massey*, supra, 232 Conn. 279. Wallace had just established Synapse Technologies, Inc., to operate as a new corporation. It was prudent for the plaintiff to include language, when defining the parties, to ensure that if Wallace established a different corporation or changed the Synapse name, that he and the new entity would still be bound by the contract. The definition of the parties or potential parties to the contract in this way does not, on its own, establish or preempt the true purpose of the contract.

Next and more important is our disagreement with the trial court's interpretation of the term "closing," which is found in part four of the contract. The trial court stated that under part four "the plaintiff was to obtain funding for financing the acquisition of the Middleburg Corporation. When this funding was consummated (described as 'the closing') defendant is to pay plaintiff its fee, together with the granting by the defendant to the plaintiff the right to acquire at closing warrants to purchase securities." The second paragraph of part four actually states that the defendant will grant the right to purchase warrants *at closing*. "Closing," in paragraph one of part four, is defined as "the consummation of the funding . . . ." "Funding" is the funding obtained "in an amount necessary to finance the plans outlined in the financing memorandum." Part two of the contract states that the plaintiff will "assist the [defendant] in the formulation of a financing memorandum for articulating the opportunity to the investment community . . . ." Therefore, it is evident that "the closing" is that point in time at which the defendant receives from the investment community sufficient funds to accomplish the plans set forth in the financing memorandum.

We conclude that the defendant's acquisition of Connecticut Innovations' rights in the assets of Middleburg was not the closing anticipated in the contract. Because Connecticut Innovations already had a security interest in the assets of Middleburg, it is illogical to suggest that Connecticut Innovations could be construed to be a member of the investment community that the defendant or plaintiff might approach with an investment "opportunity." Connecticut Innovations had only to assert its right to Middleburg's assets, as it eventually did, and *it* would have acquired Middleburg's assets.

We are also persuaded that the transaction between the defendant and Connecticut Innovations was not the closing anticipated by the parties because the first paragraph of part four specifies that "[u]pon the consummation of the funding (the 'closing'), [Wallace] shall pay to [Venture Partners] a fee in cash equal to five and one half (5.5%) percent of the gross proceeds of the funding . . . ." This court, in interpreting a contract, must "constru[e] it as a whole and reconcil[e] its clauses. . . . " (Citations omitted, internal quotation marks omitted.) *Dainty Rubbish Service, Inc.* v. *Beacon Hill Assn., Inc.*, 32 Conn. App. 530, 534, 630 A.2d 115 (1993). Thus, since the plaintiff became entitled, at the closing, to both the percentage of the funding and the warrants, we must give effect to both of these provisions. It is impossible to give meaning to both paragraphs of part four under the interpretation urged by the plaintiff. The two paragraphs have meaning simultaneously only if funding were provided by a source other than a creditor. Connecticut Innovations, in foreclosing on Middleburg's assets and selling them to the defendant, essentially only reduced the amount of debt that the defendant assumed. The plaintiff could not, and indeed did not, assert a claim for a percentage of the funding received by the defendant because the defendant was *not* funded by the Connecticut Innovations

transaction. A claim for a percentage of the funding, however, necessarily had to have been able to occur at the same time that the plaintiff became entitled to the warrants because both were tied to the closing. Moreover, Connecticut Innovations did not fund the defendant per se, but rather the defendant purchased the assets that Connecticut Innovations had owned. Therefore, the transaction between Connecticut Innovations and the defendant could not have been the closing anticipated by the parties.

We note that the parties' motives do not "prove an intent contrary to the plain meaning of the language used." (Internal quotation marks omitted.) *Levine* v. *Massey*, supra, 232 Conn. 279. There was testimony at trial by the defendant and the principals of the plaintiff that both parties thought that it would not be possible to raise any capital or equity until the three liabilities were resolved. They also testified that the resolution of the liabilities took much longer than anticipated. Finally, there was testimony that the transaction between Connecticut Innovations and the defendant was not the funding contemplated in the contract.[2] This view is buttressed by the fact that a consultant hired by the plaintiff admitted that no financing memorandum had ever been completed. According to the contract, this financing memorandum was to be the benchmark against which the parties were to determine when the defendant had received sufficient financing or, in other words, the closing. It is clear that the failure to develop

---

[2] The following exchange took place during the cross-examination of Gary Laskowski, a principal of the plaintiff:

"Q. So, the financing that you anticipated would solve the [defendant's] problem, and would be the financing that was contemplated in the contract between you and Synapse was to have Synapse substitute as debtor with [Connecticut Innovations] in place of [Middleburg]; is that correct?

"A. No.

"Q. That's not correct?

"A. No."

the financing memorandum at any time, particularly before the Connecticut Innovations transaction, indicates that the Connecticut Innovations transaction was not the closing anticipated by the parties.

Our interpretation of the contract does not deprive the plaintiff of its entire judgment award. " '[I]t is the general rule that a severable contract is one in its nature and purpose susceptible of division and apportionment.' *Pacific Timber Co.* v. *Iowa Windmill & Pump Co.*, 135 Iowa, 308, 310, 112 N.W. 771 [1907]. The determinative test is in ascertaining from the language used, read in the light of the surrounding circumstances, what was the intention of the parties. *Loud* v. *Pomona Land & Water Co.*, 153 U.S. 564, [14 S. Ct. 928 (1894)]." *Hartford-Connecticut Trust Co.* v. *Cambell*, 95 Conn. 399, 405, 111 A. 864 (1920). In determining the severability of the contract, the court looks to whether the contract's " 'parts and its consideration are common to each other' " or independent of one another. Id.; see also *Timely Products, Inc.* v. *Costanzo*, 465 F. Sup. 91, 97 n.6 (D. Conn 1979) ("singleness or apportionability of the consideration rendered is a principal test in judging severability").

We conclude, as the defendant concedes, that the contract is severable. The duties imposed on the plaintiff and the consideration the plaintiff would receive in return under part two are independent from the duties and consideration found under part four. Specifically, part two calls for the payment of a monthly retainer to the plaintiff in return for advising the plaintiff on a number of strategic and financial matters. Part four, on the other hand, calls for the plaintiff to receive a percentage of the funding it obtains and the stock warrants once the funding is actually accomplished. Thus, the consideration the plaintiff was to receive under the contract was to be apportioned according to the services it provided. We conclude that the plaintiff may

recover the fees due under part two of the contract, but not the stock warrants under part four of the contract.

The judgment is reversed only as to the award of stock warrants and the case is remanded with direction to render judgment as on file except as modified to eliminate the award of warrants.

In this opinion the other judges concurred.