[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action to foreclose a mechanic's lien in connection with the sale, delivery and installation of a modular home on real property owned by the defendants. The defendants filed a cross-complaint alleging breach of contract and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and the manufacturer's modular home warranty statute, General Statutes § 21-86. After trial, submission of briefs and closing argument, the court issued a memorandum of decision, which reserved various issues for a supplemental hearing. The defendants then moved to reargue certain of the court's findings and conclusions. The court opened its decision to allow evidence on whether the parties had intended their contract to apportioned into separate pairs of part performances[1] and granted re-argument on whether (a) the plaintiff substantially completed the work it contracted to perform and (b) the court's decision finding substantial performance considered any improper factors. Additional evidence, argument, and briefing followed. This memorandum now addresses all outstanding issues.
 I — MOTION FOR REARGUMENT A — Issues Presented 
In contracting for purchase, delivery and installation of the modular home, the parties here signed three different documents that specified the work being contracted for: the purchase agreement and two signed "proposals" for other site work and a heating system. (Plaintiff's CT Page 13476 exhibits two, eight and ten.) In its memorandum of decision, the court found that these documents constituted one contractual agreement. The court also found that the duties each party agreed to perform under that contract could, under the criteria set forth in 2 Restatement (Second), Contracts § 240, p. 229 (1981), Venture Partners, Ltd v. SynapseTechnologies, Inc., 42 Conn. App. 109, 118, 679 A.2d 372 (1996); andKunian v. Development Corporation of America, 165 Conn. 300, 334 A.2d 427
(1973) "be apportioned into corresponding pairs of part performances;" 2 Restatement (Second), supra, § 240, comment (d); or were, in more traditional contract law terminology, divisible or severable into separate sets of duties. The court also found that the plaintiff's substantial performance of its duties under certain pairs of those part performances obliged the defendants "to render performance of the agreed equivalent" by paying the plaintiff for the work done, less credits and offsets allowed by law. The court granted the defendants' request to submit further evidence and argument on these questions.
The defendants claim that the burden of proving that the parties agreed to divisibility of the agreements fell on the plaintiff. (Def.s' Mem. of Law dated July 9, 2001 at 1.) They assert that they would have not agreed to partial performance of the contract as an agreed equivalent. (Id. at 3.) They argue that the evidence establishes that they agreed only to the whole transaction and would not have agreed to a divisible contract. (Id. at 3-4.) They also argue that the plaintiff did not intend the contract to be divisible. (Id. at 5.)
 B — Defendants' Argument re Apportioning the Contract into Separate Pairs of Part Performances as Agreed Equivalents
The defendants argue that "the intent of the parties was not to form a divisible contract." (Id. at 1.) The court finds that no credible evidence was offered, either at trial or the supplemental hearing, that when entering into these agreements, either party:
 (a) contemplated the question of whether the overall contractual agreement, consisting of the three signed documents, was divisible, severable, or (in the parlance of the Restatement) apportionable into separate pairs of part performances as agreed equivalents; or
 (b) specifically intended not to form a divisible (or apportionable) contract.
Heather Bednar testified at the supplemental evidentiary hearing that building a house quickly was important to the defendants; that she CT Page 13477 believed she was signing one agreement instead of separate contracts;[2]
and that she focused on the total cost instead of the price of individual components of the agreement. Even if the court found this testimony credible, however, it would not defeat application of the rule of apportionment of part performances as agreed equivalents under any of the agreements.
The parties' lack of intent or agreement as to whether the overall contractual agreement could be apportioned into separate pairs of partial performances as agreed equivalents (or would be divisible) does not preclude it being such, if it meets the applicable criteria. Nor would the fact that the defendants may have focused their attention only on the bottom-line total price, as opposed to the costs of the separate components of the various agreements. The Restatement establishes two criteria for a divisible contract: (1) "apportionment" — that the parties' performances can be apportioned into corresponding pairs of part performances; and (2) "agreed equivalents" — that the parts of each pair of performances are agreed equivalents:
 If the performances to be exchanged under an exchange of promises can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents, a party's performance of his part of such a pair has the same effect on the other's duties to render performance of the agreed equivalent as it would have if only that pair of performances had been promised.
2 Restatement (Second), supra § 240, p. 229 (1981).
 This court has previously noted that no language in the agreements specifies an intent to make them severable. As Professor Corbin notes, however, "in most of the cases where the matter is in litigation, the parties had no "intention [regarding divisibility of their agreement] and none can be found by an honest process of interpretation of their expressions." 3A A. Corbin (1960), Contracts § 694, p. 283; see also 2 Restatement (Second), Contracts § 240, comment (e) (1981) ("[t]he parties may, by express provision, determine either that it is or is not proper so to regard them. But they do not often do this, and, because separate pairs of corresponding parts are not the subjects of separate bargains . . ., the parties usually cannot even be said to have had any actual intention on the point."). Thus, the CT Page 13478 absence of contractual language specifying that the agreements were intended to be divisible is neither unusual nor a bar to their being such.
. . .
 As the Restatement points out, however, the rules on divisibility of a contract arise only when the parties intended a single contract. If there were separate contracts, then a party's failure to perform on one contract would have no effect on the duty of the other to perform under a separate contract; the performance under each is necessarily separate and there is no need to inquire about divisibility. Hence, the parties' intention to have a single contract here does preclude divisibility of the agreements.
This court reaffirms its previous decision that the agreement here met both requirements.[3]
 C — Defendants' Argument re Substantial Performance of a Mechanic's Lien
The defendants also argue that even if the contract could be apportioned into agreed equivalents of part performances, "a partially performed divisible contract is not appropriate to support the foreclosure of a mechanic's lien." (Def.s' Mem. of Law, July 9, 2001, at 4.) The defendants in effect claim that substantial performance of an apportioned agreed equivalent may not be the basis for foreclosure of a mechanic's lien. This court rejects that proposition. The defendants cite no valid reason for not applying the law of substantial performance and agreed equivalents to mechanic's liens. As long ago as The Martin Tire RubberCo. v. The Kelly Tire Rubber Co., 99 Conn. 396, 122 A. 102 (1923), our courts recognized that the time for filing a mechanic's lien begins with the date of substantial completion of the contracted work. Our courts have expressly recognized, moreover, that the amount of a mechanic's lien is diminished by "the reasonable cost to complete the contract satisfactorily;" Anthony Julian R.R. Construction v. Mary Ellen DriveAssociates, 39 Conn. App. 544, 547, 664 A.2d 1177, cert. denied,235 Conn. 930, 667 A.2d 800 (1995); an implicit recognition that substantial performance supports foreclosure of a mechanic's lien. Such cases as Argentinis v. Gould, 23 Conn. App. 9, 579 A.2d 1078 (1990), rev'd on other grounds, 219 Conn. 151, 592 A.2d 378 (1991), Edens v. KoleConstruction Company, 188 Conn. 489, 450 A.2d 1161 (1982) overruled in part, 219 Conn. 151 (1991), and Simonetti v. Lovermi, 15 Conn. App. 722,546 A.2d 331 (1988), all recognize, while not explicitly so holding, that CT Page 13479 substantial performance would warrant foreclosure of a mechanic's lien.
The defendants' argue that applying the contract rule of substantial performance to actions on mechanic's liens "can only be done by disregarding . . . holdings of our Supreme Court." They cite Hall v.Peacock Fixture and Electric Co., 193 Conn. 290, 296, 475 A.2d 1100
(1984), and Seaman v. Climate Control Corporation, 181 Conn. 592, 601,436 A.2d 271 (1980), both cases where the court noted that it "has specifically rejected the proposition that a mechanic's lien may be founded on the basis that the owner is unjustly enriched by the improvement of its property." Although both Hall v. Peacock Fixture andSeaman v. Climate Control so hold, they did so in contexts not applicable here. In Hall, the court rejected arguments that unjust enrichment should override the fact that a property owner had not consented to the work on which the mechanic lien was claimed. In Seaman, the court held that a subcontractor held a lien to the extent of general contractor's claims against the owner even though the first-tier subcontractor has been fully paid. Neither case holds as sweepingly as the defendants here claim. None of the other cases they cite, moreover, hold that either risk of forfeiture or unjust enrichment is an improper factor to consider in deciding whether the contractual agreement on which a mechanic's lien is based had been substantially completed. In none of the cases cited by the defendants did enforcement of the mechanic's lien depend, as here, on whether the contracted work had been substantially completed; instead the cases the defendants cite involved such situations as where a contractor had not perfected a mechanic's lien; Reidville Commercial Associates v.Bennett, judicial district of Waterbury, Docket No. 108618 (March 18, 1993, Coffield J.); or other instances where courts rejected unjust enrichment of the owner as a basis for a mechanic's lien not comporting with statutory requirements.
Analytically, the question of whether risk of forfeiture is a relevant factor in determining substantial performance of contracted work is completely different from whether substantially completed work may be the basis for foreclosure of a mechanic's lien. The case of Simonetti v.Lovermi, supra, illustrates this proposition. In Simonetti, a subcontractor's action to foreclose a mechanic's lien was consolidated for trial with the claims of the property-owning general contractor, his co-owner wife, and their joint partnership for breach of contract against the subcontractor. A "hostile personal relationship" between the subcontractor and general contractor "culminated in an incident at the work site that led to [the subcontractor] being ordered off the site by [the general contractor]." The trial court expressly found that the subcontractor's "conduct terminated the contract." Id., 723-724. After the property owning general contractor/owners substituted a bond for the lien, the subcontractor's claim became one to recover on the bond CT Page 13480 (but was limited, by terms of the bond statute, to the rights it held under the mechanic's lien; Camputaro v. Stuart Hardwood Corporation,180 Conn. 545 (1980). The Appellate Court expressly recognized the equitable factor of unjust enrichment as justifying a finding of substantial performance. Simonetti v. Lovermi, supra, 15 Conn. App. 725.
Even were this court to disregard the factor of risk of forfeiture, however, this court's various findings of substantial performance in the previous decision would not change. Consideration only of the other factors still leads the court to make the same findings, for the reasons explained in the previous decision and below.
 D — Defendants' Argument re Substantial Performance of Contracted Work
Finally, the defendants argue that the plaintiff did not substantially perform the purchase agreement or site work. The court will address these arguments in turn.
The primary argument the defendants make that this court has not already addressed in its earlier decision is their claim that the defendants cannot be adequately compensated "for the part of the benefit of which [they] will be deprived." (Def.s' Mem. of Law dated July 9, 2001, at 8.) They make this assertion based on their claim that they contracted for a modular home, rather than for standard construction of a house, because they wanted their house built rapidly. Id. They claim that "getting a home in a rapid manner" "was a material factor in [their] decision to enter into the contract in question" and that the delay in completion "is a harm that is uncompensatable and difficult to measure." (Id. at 9.) This court finds, to the contrary, that the defendants offered sufficient evidence to establish the harm they suffered by virtue of the delay and the plaintiff's failure to complete the contracted work. Specifically, John Bednar lost four weeks of work, for which the court's memorandum of decision awarded compensation, and the Bednars incurred costs for storing their furniture. The court's original memorandum of decision overlooked those storage costs, which this memorandum will include in its final award.[4]
The defendants also claim that the plaintiff never intended to "cure its failure" to complete the work:
 Mr. Carlson reassured them that everything would be fixed, but the lack of fire stopping and anchors between the tops of the A B modules would be unknown to his day except for the current litigation. . . . Any assurances the Bednars received as to correction CT Page 13481 of defects was obviously false. . . .
(Id.) They further argue that the plaintiff cannot benefit from the fact that the manufacturer sent work crews to the site to complete the work. (Id. at n. 2.) Yet this court found that the plaintiff relied in good faith on the manufacturer to remedy all problems and complete the unfinished installation of the modular home. The court also found that the plaintiff had no reason to believe the manufacturer had not installed the fire stopping. When the plaintiff learned that the fire-stopping and anchors had not been installed, the plaintiff immediately arranged for this work to be done.
Finally, the defendants argue that the plaintiff's actions "cannot be held to comport with the standards of good faith and fair dealing." (Id. at 10.) This court's previous decision fully discussed the question of good faith and its application to substantial performance here.
Taking into consideration all the arguments made by the defendants, the court nonetheless still concludes, for the reasons stated herein and its previous decision, that the plaintiff substantially completed the purchase agreement. As for the site work, the court has found that the individual site work agreements are themselves apportionable into separate pairs of part performances as agreed equivalents under the Restatement criteria. The court thus examined each contracted component to determine if the plaintiff completed, or substantially completed, that individual component. The court agrees with the defendants that the plaintiff did not substantially complete the electrical or plumbing work, and has so held previously. Nothing the defendants argue in their memorandum, however, changes the court's finding that the plaintiff's work in pouring the concrete walls for the house and garage foundations satisfies the requirements for substantial performance of that work. See, e.g., MasdaRealty Corp. v. Name Realty Corp., 151 Conn. 204, 207, 195 A.2d 559
(1963).
 II — COUNSEL FEES, FORECLOSURE, DAMAGES AND OTHER RELIEF A — Counsel Fees[5]
Counsel for the plaintiff has submitted affidavits as to his hours of work, the nature of that work, and billing rate for legal work through August 31, 2001, of $21,826.35. Counsel for the defendant has submitted affidavits claiming counsel fees of $6,619.76. Both plaintiff and defendants are entitled to awards of attorney's fees.[6]
Although the statutory criterion for an award of attorney's fees in foreclosure proceedings and under CUTPA and the modular home warranty act CT Page 13482 is "reasonableness," our appellate courts have directed trial courts to consider the following twelve factors enunciated in Johnson v. GeorgiaHighway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974), as guidelines provided for determining a reasonable attorney's fee under CUTPA:
 (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.
Steiger v. J.S. Builders, Inc., 39 Conn. App. 32, 38, 663 A.2d 432
(1995). No appellate or trial court case addresses the factors to be considered in an award of attorney's fees under General Statutes §21-86. In foreclosure cases, appellate and trial courts have considered a variety of factors, including the Johnson guidelines; Bell TowerCondominium Assn. v. Muhammad, judicial district of Fairfield at Fairfield, Docket No. 0347431 (July 25, 2000, Mottolese, J.); "characteristics of the billings which reveal waste, excess, duplication and the like"; Id.; and "the necessary time required and the necessity of a trial;" Hartford Federal Savings Loan Assn. v. Tucker, 196 Conn. 172,182, 491 A.2d 1084, cert. denied, 474 U.S. 920, 106 S.Ct. 250,88 L.Ed.2d 258 (1985).
In addition to the various factors cited above, an award of attorney's fees may also take into account public policy concerns. Thus, under CUTPA, attorney's fee awards are intended to enhance the private CUTPA remedy and encourage private CUTPA litigation to further the remedial purposes of the statute. Hinchliffe v. American Motors Corporation,184 Conn. 607, 617 (1981); Ivey, Barnum O'Mara v. Indian HarborProperties, 190 Conn. 528, 534 (1983). While an award of attorney's fees in foreclosure proceedings has the purpose of encouraging contractual compliance and timely payment, it also has the effect of discouraging foreclosure defendants from asserting frivolous defenses or employing dilatory tactics. Bell Tower Condominium Assn. v. Muhammad, supra. The danger inherent in any statutory scheme awarding counsel fees to a prevailing party "is that the defendant may be reluctant to raise a CT Page 13483 meritorious defense because he fears that if he loses he will have to pay not only his own cost of defense but the plaintiff's costs as well." Id. At least one Superior Court judge has concluded that in foreclosure proceedings this danger dictates a "balancing test between the statute's salutary purpose of encouraging contractual compliance and timely payment on the one hand and discouraging the assertion of good faith defenses, counterclaims and setoffs on the other." Id., citing Markt v. Ro-Mart,Inc., 471 F. Sup. 1292, 1299 (N.D.Cal. 1979).
In this proceeding, each party was only partially successful on the claims and defenses asserted and presented at trial. The court has reviewed the attorney's fees affidavits of counsel from both parties in detail. The awards of attorney's fees here are complicated by the fact that none of the attorney's fees affidavits submitted sufficiently allocate the time expended to the successful claims warranting attorney's fees or to the unsuccessful claims. See Jacques All Trades Corp. v.Brown, 57 Conn. App. 189, 199 (2000) ("[T]he court can award attorney's fees under CUTPA only for those expenses that were related to the prosecution of a CUTPA claim.") While some of the pre-trial and post-trial work detailed on the affidavits can be attributed to specific successful claims, much cannot be. Each lawyers's affidavits show a substantial portion of the time spent defending against the opponent's successful claims. Another substantial portion of each attorney's time was for pretrial work, presentation of evidence at trial, and post-trial work that relates equally to each party's claims. For example, all evidence as to the actual installation of the modular homes, and follow-up correction efforts by the plaintiff and then the manufacturer, provided the factual bases for proving both the plaintiff's claim that it had substantially completed the contracted work and also the defendants' claim that the plaintiff committed unfair trade practices.
1. Attorney's fees for the plaintiff
Although finding that a reasonable attorney's fee for the plaintiff would be $14,018.19, or fifteen per cent of the amount due for substantial performance, the court's original memorandum of decision also scheduled a supplemental hearing and briefing on issues relating to an award of fees to the parties. The court now concludes that neither that percentage basis nor awarding counsel fees for all the spent by plaintiff's counsel is appropriate for determining the award of plaintiff's attorney's fees.
As noted above, the time spent by plaintiff's counsel cannot all be attributed to the claims on which the plaintiff prevailed. The court also finds here that, but for the defendants' pursuit of their CUTPA claims and defense against the plaintiffs' claims through examination of CT Page 13484 witnesses at trial, the lack of fire-stopping in the ceiling of the first floor modules would probably never have been discovered except after a fire. From the court's review of the attorney's fee affidavits and its observation of the amount of time spent at trial on the various issues, the court concludes that an award of all the fees claimed, or even of the fifteen per cent of total indebtedness, would not adequately discount the claimed fees for the amount of time needed to defend against the defendants' successful claims or take into account other relevant factors cited above. Moreover, by demanding payment prematurely, the plaintiff bears the major (though not sole) responsibility for the dispute that led to the plaintiff walking off the job and not completing the contracted work. The case of Simonetti v. Lovermi, supra, 15 Conn. App. 726, suggests that "[i]t would be inequitable . . . to allow the party in default under the contract to recover attorney's fees after its own wilful breach led to the litigation for which the fees were incurred." While the circumstances here are not so extreme as in that case, the plaintiff's greater culpability in the dispute that led to this litigation also requires some reduction in counsel fees. After thoroughly reviewing the fee affidavits submitted by plaintiff and taking into account all these factors, including the guidelines suggested by other courts, the court concludes that a reasonable attorney's fee here for plaintiff is $10,000.
2. Attorney's fees for the defendants
Counsel for the defendants has proposed to resolve the inability to allocate precisely how much time he spent on successful claims by estimating. He approximates that, except for certain hours spent exclusively on the CUTPA time, fifty per cent of certain time was spent on the defendants' successful claims warranting attorney's fees and that two-thirds of the transcript costs is fairly attributable to pursuit of the CUTPA and § 21-86 claims. While the plaintiff challenges these percentages as having "no basis in reality;" (Pl.'s Mem. of Law Re Attorney's Fees and Punitive Damages dated 5/9/2001); this court disagrees. The court is thoroughly familiar with the legal and factual issues involved and has reviewed the affidavits submitted by the defendants' attorney. The court finds that these percentage approximations, submitted by counsel under oath, are a fair and reasonable basis for allocating the time and expenses reported on his first attorney fee submission;(Affidavit of Attorney Fees dated 4/12/01 at 2-4); as divided between CUTPA and § 21-86 claims and other claims not warranting attorney's fees. On the second attorney fee submission, the court concludes that 7.5 hours claimed for preparing the motion to reargue and a memorandum regarding substantial performance are not allocable to CUTPA or § 21-86 and that the four hours for work on punitive damages is fully attributable to the CUTPA claim. (Pl.'s CT Page 13485 Affidavit of Attorney Fees dated 9/17/01 at 1.)
This court has thoroughly considered all of the Johnson guidelines. The defendants had a difficult factual case on the CUTPA count; the statutory warranty claim, on the other hand, was relatively routine and straight-forward. Counsel showed good skill in developing and eliciting the factual bases for the defendants' CUTPA claims and in arguing their legal merit. Although this was not a controversial case or in the public eye, there was also a level of "undesirability" in taking on the defendants' CUTPA claims, in the sense that they would have seemed relatively weak until the lack of fire-stopping was discovered during the trial as a result of inquiries by the defendants' attorney. The court finds that the hourly rates charged by plaintiffs' counsel (which varied from $50 per hour for pretrial viewing of the videotapes the defendants made, to $75 for trial preparation of client testimony, and to $150 and $175 per hour for other work) are reasonable and customary fees for similar work in the community. Taking into consideration the "full panopy" of Johnson factors; Riggio v. Orkin Exterminating Co., Inc.,58 Conn. App. 309, 317-18, cert. denied, 254 Conn. 917 (2000); the court finds that a reasonable attorney's fee for the defendants is the amount of $6,356.
 B — Foreclosure of the Mechanic's Lien 1. Finding of debt amount and interest through date of decision[7]
The court previously found that the defendants' total debt for the work that the plaintiff substantially performed is $93,454.62. The court also found it appropriate to award statutory and contract interest — "the former from November 4, 1998, the date when various portions of the work that plaintiff contracted to do were substantially completed (by virtue of the manufacturer's work crew having that day completed its second round of work at the premises) and the latter from the date of the completion of fire-stopping for the bottom two modules." At the supplemental hearing, the parties stipulated that the fire-stopping was completed fourteen days after the end of evidence on February 10, 2000. The court will thus award contract interest from February 24, 2000, in the amount of $26,961.02.
The defendants' re-argument on the issue of substantial performance, however, has caused the court, suo moto, to reconsider and, for the reasons set forth in the margin,[8] rescind its order of statutory interest under General Statutes § 37-3a.
The court therefore finds that total debt and interest is therefore as follows: CT Page 13486
Value of work substantially completed $93,454.62
Contract interest, February 24, 2000, though September 24, 2001 26,961.02 _____________ TOTAL AMOUNT OF DEBT AND INTEREST $120,415.64
2. Fair Market Value of Subject Real Estate
The court finds that the fair market value of the subject real estate owned by defendants at 166 Westside Road in Woodbury is $293,910. (Although the plaintiff submitted an updated appraisal from June 2001 indicating a lesser value, that appraisal simply stated that the previous appraisal, based on a drive-by appraisal of the property on October 7, 1999, remained accurate. The updated appraisal thus did not take into account the value of inflation, to which the appraiser testified at trial, and the presence of a basement on the premises. See Findings of Fact, paragraph number 39, and footnote nine, in the previous decision.
3. Other indebtedness on the property
At the supplemental hearing, the parties stipulated that Webster Bank holds a prior mortgage on the subject property with a current principal balance of $187,879.12 as of the hearing date. The court has since inquired whether the parties could stipulate as to whether the balance had significantly decreased, and counsel for the defendants has reported the present unpaid balance, as of this date, of $187,327.51; although plaintiff's counsel has not stipulated to this latter amount, plaintiff has no objection to it.
 C — Recovery by Defendants 1. Damages
In its memorandum of decision, tile court found that the defendants had incurred expenses of $18,961.07 to finish the work that the plaintiff did not complete. As noted above, however, that amount inadvertently omitted their expenses for storing furniture and personal goods after they left their former residence and lived with Mr. Bednar's mother while they waited to move into the subject property here. The court finds that they incurred $237.49 in storage fees. Thus the expenses they incurred, as a result of the delay in completing the contracted work and to finish the work themselves, total $19,198.56.
To assess the damages to defendants, however, the court must also CT Page 13487 subtract from that amount $9,475.00 in expenses that defendants avoided because plaintiff did not complete the contracted work[9] and $7,575.63 to avoid double recovery.[10] The court thus finds that the total damages incurred by the defendants for the plaintiff's breach of contract are as follows:
Expenses incurred from delay or completing work $19,198.56
Less Expenses avoided 9,475.00
 Less Deductions to avoid double recovery 7,575.63 ___________ TOTAL DAMAGES INCURRED FOR BREACH OF CONTRACT $2,147.93
As noted in the court's earlier decision, the court has also determined that awards of nominal damages of $100 are appropriate under second and fourth counts.
2. Punitive Damages
Under CUTPA, "[t]he court may, in its discretion, award punitive damages . . . as it deems necessary or proper." General Statutes §42-110g (a). Our Appellate Courts have established as the criterion for awarding punitive damages that "there is evidence of a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . ." (Internal quotation marks omitted.)Staehle v. Michael's Garage, Inc., 35 Conn. App. 455, 462-63, 646 A.2d 888
(1994), quoting Gargano v. Heyman, 203 Conn. 616, 622, 525 A.2d 1343
(1987). An award of punitive damages is discretionary. Perkins v.Colonial Cemeteries, Inc., 53 Conn. App. 646, 648-49 (1999). The trial court's exercise of this discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been done Gargano v. Heyman, supra, 203 Conn. 622. Our Appellate Courts have set no precise standard for the measure of punitive damages, such also being a matter for the sound discretion of the Trial Court.
This court has already found that the plaintiff's conduct in initially concealing the gap in the first floor ceiling without installing fire stopping constitutes just such reckless indifference to the rights of others and poses such a risk of substantial harm to the consumer as to warrant an award of punitive damages. At the supplemental hearing and in briefs submitted, the parties have suggested several factors for the court to consider in determining the amount of punitive damages to award here.
The defendants argue, and the court concurs, that the plaintiff's CT Page 13488 conduct, as found by this court, created a fire safety hazard that, until corrected, posed a potential risk of death or serious bodily harm, to the defendants and their family. They also correctly point out that if this case had settled before trial, the lack of fire-stopping at the top of modules A and B might have gone unknown forever, or at least until some tragedy. They argue that the court should set punitive damages to deter both this plaintiff and other builders from constructing homes that are not safe. In their memorandum of law, they urge the court to award punitive damages in an amount sufficient to prevent the plaintiff from any recovery in this case. The plaintiff, on the other hand, argues that preventing any recovery of profit in this case, approximately $7,000, would be an appropriate measure of punitive damages.
There are substantial mitigating factors that affect the award of punitive damages here. By the end of the first day, the defendants knew about the lack of fire-stopping in the ceiling between the bottom modules. Within days, the manufacturer had also been alerted to this and other problems and had work crews on site to address the defendants' complaints. Both parties reasonably relied on the manufacturer to correct all the known problems. Neither party knew that the manufacturer did not do so. When the plaintiff learned that the manufacturer had not installed the fire-stopping, the plaintiff arranged for the manufacturer to do so. This case also involves a situation where, because of a dispute between the parties in which both had some fault, the plaintiff was not on site after October 22, 1998, and did not complete the work it had contracted to do. The plaintiff had no way to verify first-hand whether the manufacturer had installed the first floor ceiling fire-stopping in 1998; the defendants, who remained on site while the manufacturer's work crews were there, did. Moreover, the manufacturer offered to pay the defendants' costs for hiring a structural engineer to ensure the structural integrity of the building, but they never accepted that offer.
This case thus does not present as stark a factual scenario as depicted by the defendants. Whatever the plaintiff's motive or intention for initially failing to install the fire-stopping between the modules, everyone — plaintiff, defendants, and manufacturer — knew about the problem almost immediately. After the payment dispute between the parties and the plaintiff walked off the job, the defendants ordered the plaintiff not to return to the property or be subject to arrest for trespassing; thus, the plaintiff was unable to monitor or verify first-hand the work being done by the manufacturer's work crews. Although all parties knew that the vertical gap between the modules ran from basement to attic, for some reason the manufacturer, whose work the defendants carefully monitored first-hand, focused its repair and fire-stopping efforts only on the attic gaps. CT Page 13489
For all these reasons, this court concludes that punitive damages in the amount sought by plaintiffs, which might be reasonable in other circumstances, are not appropriate here. Nor, however, does the court conclude that the using anticipated profits as the sole measure of punitive damages, as suggested by plaintiff, is adequate or appropriate in view of the risk posed by plaintiff's conduct, the hazard to which it exposed the defendants, and the need to consider the remedial and deterrent purposes of punitive damages fee awards under CUTPA. Hinchliffev. American Motors Corporation, supra, 184 Conn. 614ff. The court concludes that an award of punitive damages in the amount of $15,000 is, taking into consideration all the applicable factors, appropriate here.
 D — FINAL ORDERS 1. Judgment of Strict Foreclosure
Since the total amount of debt here (approximately $187,000 on the first mortgage plus $120,415.64 on the mechanics lien) exceeds the fair market value of the subject property, the court finds that a strict foreclosure is appropriate. The court therefore enters a judgment of strict foreclosure on count one of the plaintiff's amended complaint in favor of the plaintiff against the defendants. The court awards a title search fee to plaintiff of $150, an appraisal fee of $350, and an attorney's fee of $10,000.
The court sets a law day of November 13, 2001, for the owner of the equity of redemption, and subsequent dates in inverse order of priority.
2. Judgment on Cross Complaint
The court enters judgment in favor of the defendants against the plaintiff on the first (breach of contract), second (CUTPA), and four (breach of warranty). The court enters judgment for the plaintiff on the second count of the cross complaint. The court awards damages to the defendants as follows: on the first count, damages in the amount of $2,147.93; on the second count, nominal damages of $100 and punitive damages of $15,000; and on the fourth count, nominal damages of $100. The court awards a reasonable attorney's fee to the defendants for prevailing on their CUTPA claim in the second count and under General Statutes § 21-86 in the fourth count in the amount of $6,356.
SO ORDERED.
BY THE COURT CT Page 13490
STEPHEN F. FRAZZINI, JUDGE OF THE SUPERIOR COURT