**VERMONT PURE HOLDINGS, LTD., Plaintiff,**

v.

**DESCARTES SYSTEMS GROUP, INC. and Endgame Systems, Inc. f/k/a DSD Solutions, Inc., Defendants.**

No. 2:00–CV–269.

United States District Court,
D. Vermont.

April 10, 2001.

Kevin F. Berry, Thomas B. Fiddler, Cozen and O'Connor, Philadelphia, PA, Michael J. Marks, Tarrant, Marks & Gillies, Montpelier, VT, for Vermont Pure Holdings, Ltd., plaintiff.

Robert S DiPalma, Paul, Frank & Collins, Burlington, VT, for Descartes Systems Group, Inc., defendant.

## OPINION AND ORDER

SESSIONS, District Judge.

This is a diversity action for breach of contract by Vermont Pure Holdings, Ltd. ("Vermont Pure") against Descartes Systems Group, Inc. ("Descartes") and Endgame Systems, Inc. ("Endgame") (collectively, "Defendants").[1] Defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(3) for improper venue, alleging that, under the contracts entered into by the parties here, the Province of Ontario, Canada, is the proper forum and, alternatively, that the parties agreed to submit any disputes under the contracts to binding arbitration. For the reasons set forth below, and after full consideration of the parties' briefs and oral argument, the Court **GRANTS** Defendants' motion to dismiss.

---

1. While the contracts at issue in this case were originally negotiated and executed by Descartes, Descartes later assigned its rights and obligations under both contracts to End- game. For purposes of the ruling on this motion, however, there is no need to distinguish between the two defendants.

## I. Background

Vermont Pure is a Delaware corporation whose principal place of business is in the State of Vermont. It is in the business of bottling and selling spring water and supplying coffee and related products to primarily business customers. Defendants are corporations organized under the laws of the Province of Ontario, Canada, and whose principal offices are located in Ontario.

Vermont Pure alleges that in early 1999, Descartes "made a proposal to Vermont Pure to provide a package of design, products and services that would allow efficient computerized management of Vermont Pure's distribution," called "the Energy® Suite." Compl. ¶ 9 (Paper 1). Pursuant to this proposal, Vermont Pure entered into two contracts with Descartes, both of which were executed on the same day (March 30, 1999): a Software License Agreement ("SLA") and a Professional Services Agreement ("PSA"). In the SLA, the parties agreed that Descartes would supply certain computer hardware and software to Vermont Pure. In the PSA, Descartes agreed to "provide professional services to Vermont Pure to support design, training, technical support and project management for the installation and implementation of the Energy Suite and associated hardware." *Id.* ¶ 16.

The SLA contains a forum selection clause which states: "This Agreement shall be governed by and construed under the laws of the Province of Ontario ... and the parties hereby submit to the sole and exclusive jurisdiction of the courts of the Province of Ontario for all matters under this Agreement that may be properly resolved by judicial decision." SLA § 10.22 ("Governing Law") (Paper 12, Ex.

B). The SLA also contains an arbitration clause, mandating that, with exceptions not relevant to this litigation,

> any dispute or controversy between the parties *arising out of or relating to* this Agreement (each, a 'Dispute') shall be resolved by good faith negotiations between the parties.... If such negotiations fail to produce a resolution to the Dispute, the Dispute shall be determined by arbitration before a single arbitrator pursuant to the Arbitration Act, 1991 (Ontario). The award rendered by the arbitrator shall be final, binding, conclusive and not subject to appeal.

*Id.* § 10.12 ("Dispute Resolution") (emphasis added).

The PSA, however, contains neither a forum selection clause nor an arbitration clause. *See* PSA (Paper 12, Ex. A). The PSA does contain a "Governing Law" section, though, similar to the one in the SLA. However, unlike the SLA, the PSA's "Governing Law" section, while mandating application of Ontario law, does *not* require that the parties submit to the sole and exclusive jurisdiction of Ontario courts for all matters subject to judicial resolution. *See id.* § 8.14.

Moreover, while the SLA contains a broad disclaimer of warranties, *see* SLA § 4.4, the PSA provides that "[a]ll services rendered by Descartes will be performed in a workmanlike manner by personnel having a level of skill commensurate with their responsibilities." PSA § 1.2. Both the SLA and the PSA contain integration clauses.

According to the complaint, since the execution of the two contracts, Vermont Pure has been unsatisfied with the performance of its new computer system,[2] and has repeatedly complained to Descartes

---

2. For example, Vermont Pure asserts that, at the time of the filing of this lawsuit, the following ongoing problems remain: "an inability to reconcile reports; production of balances that differ from report to report; problems with dial-up; delays in installation of power ware; difficulty in producing commission reports and other issues." Compl. ¶ 25.

concerning its failures. *See* Compl. ¶¶ 22–23. Defendants, on the other hand, have demanded additional[3] payments from Vermont Pure totaling $422,841.10. Of that amount, according to Vermont Pure, approximately $320,100 is in connection with the PSA and $103,507 is in connection with the SLA. *See id.* ¶ 28. Vermont Pure claims that "[t]he sums billed and demanded by the defendants vastly exceed the prices estimated for successful implementation of the Energy Suite system, even allowing for some changes in the project since its inception. The most serious overruns are under the Professional Services Agreement." *Id.* ¶ 29.

Vermont Pure brought this lawsuit on July 27, 2000, alleging that the "system has not performed as promised" and "has still not been satisfactorily installed." *Id.* ¶ 22. In the first two counts of its complaint, Vermont Pure seeks damages for Defendants' breach of the PSA and Defendants' duties to "assure that all services provided would be in a workmanlike manner; would be by skilled professionals; would be commensurate with the budget promises by Descartes; and, would be effective to implement the Energy Suite in the manner promised by Descartes." *Id.* ¶¶ 30–37. In Count III, Vermont Pure seeks a declaratory judgment that because of Defendants' breaches, it is not liable to Defendants for any of the amounts demanded. *See id.* ¶¶ 38–40. The amount for which Vermont Pure seeks a declaratory judgment in Count III includes amounts due under both the SLA and the PSA, although the "vast majority" is associated with the PSA. *See id.* ¶¶ 26–27.

Defendants now seek to dismiss the complaint, on the grounds of improper venue under Federal Rule of Civil Procedure 12(b)(3). They assert that this Court is the improper forum for this action because the parties selected the courts of Ontario in the forum selection clause in the SLA, or, alternatively, because they agreed to binding arbitration in the SLA. They assert that the two contracts are "inextricably intertwined and, as such, should be treated as one, unified contract," Defs.' Mot. to Dismiss Compl. at 3 (Paper 10), and thus, suggest that the forum selection and arbitration clauses (which were included in the SLA only) should apply to any dispute arising from the entire transaction. As a third alternative ground for dismissal, Defendants assert that because the arbitration clause requires arbitration of any disputes "arising out of or *relating to*" the SLA, it applies "on its face" to disputes arising out of the PSA, since the PSA "relates to" the SLA. *See id.* at 4.

## II. Discussion

The Second Circuit has repeatedly emphasized that "federal policy strongly favors arbitration as an alternative dispute resolution process." *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.,* 923 F.2d 245, 248 (2d Cir.1991); *see also, e.g., Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.,* 58 F.3d 16, 19 (2d Cir.1995); *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 45 (2d Cir.1993). Because of this federal policy, the Second Circuit has held that courts must "construe arbitration clauses as broadly as possible," and "compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."[4] *Collins & Aik-*

---

3. As of the filing of the complaint, Vermont Pure alleges that it has already paid approximately $227,399 in connection with the PSA and $492,399 in connection with the SLA. *See id.* ¶ 28.

4. Although this is not a case in which the Court has been asked to *compel* arbitration, this holding should apply with equal force in the context of a motion to dismiss for improper venue based on an arbitration clause.

*man*, 58 F.3d at 19 (internal quotation marks omitted); *see also David L. Threlkeld*, 923 F.2d at 248 (holding that, while "parties may not be compelled to submit a commercial dispute to arbitration unless they have contracted to do so, federal arbitration policy requires that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration") (citations and quotation marks omitted); *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 63 (2d Cir.1983) (same). Moreover, "[t]he policy in favor of arbitration is even stronger in the context of international business transactions." *David L. Threlkeld*, 923 F.2d at 248.

■ Further, "[w]hen deciding whether the parties agreed to arbitrate a certain matter ..., courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).[5] The applicable "state" law in this case is Ontario law, which holds that the general rule in interpreting any document is "that the meaning to be put upon it is the plain, clear, and obvious result of the words used, understood in their plain, ordinary and popular sense." *Doral Holdings Ltd. v. Steinberg, Inc.*, 60 O.R.2d 554,

¶ 25 (Ont.1987). Moreover, "principles of contractual interpretation require that ... meaning and purpose be given to all [an agreement's] provisions." *Scanlon v. Castlepoint Dev. Corp.*, 11 O.R.3d 744, ¶ 103 (Ont.Ct.App.1992) (concurring opinion). Thus, applying these principles to contracts containing such language as "arising out of or relating to," courts should generally assume that each of the terms ("arising out of" and "relating to") have distinct and independent meanings, and should understand these terms in their plain, ordinary, and popular sense. *Accord Coregis Ins. Co. v. Am. Health Found.*, 241 F.3d 123, 128 (2d Cir.2001).

The Second Circuit has recently analyzed the terms "arising out of" and "related to"[6] as those phrases appeared in an insurance policy, and held that the ordinary meaning of the term "related to" was clear, unambiguous, and quite broad. *See id.* at 128–29. Moreover, it noted that while the phrase "arising out of" is usually interpreted as indicating a causal connection, the term "related to" is "typically defined more broadly" and is not necessarily tied to the concept of causality. *See id.* at 128. Rather, the Court noted that "related" has been defined simply as "con-

---

**5.** "Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Five years before the Supreme Court decided *First Options,* the Second Circuit held that "[q]uestions of venue and the enforcement of forum selection clauses are essentially procedural, rather than substantive, in nature." *Jones v. Weibrecht*, 901 F.2d 17, 19 (2d Cir.1990) (per curiam). Moreover, arbitration clauses are considered to be a subset, or species, of forum selection clauses. *See Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) ("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the

procedure to be used in resolving the dispute."); *Bense v. Interstate Battery Sys. of Am., Inc.*, 683 F.2d 718, 720 (2d Cir.1982) (citing *Scherk*). Thus, before *First Options*, the Court would have logically concluded that a district court sitting in diversity should apply federal law to a motion to dismiss for improper venue stemming from an arbitration clause. *First Options*, however, requires the Court to look to the applicable "state" (here, Ontario) law. In any event, because the principles upon which the Court relies seem to be fairly universally accepted, the determination of this issue is unlikely to affect the ultimate outcome in this case.

**6.** The Court assumes that there is no difference between the meanings of the terms "related to" and "relating to" in this context.

nected by reason of an established or discoverable relation," and treated the term "related to" as synonymous with "connected to," "associated with," and "brought 'with reference to.'" *Id.* at 128–29; *see also Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir.1987) (holding that if a plaintiff's allegations "touch matters" covered by a contract with a classically broad arbitration clause—mandating arbitration of any claims "arising out of or relating to" the agreement—those claims must be arbitrated).

There can be no question that the arbitration clause at issue here, which mandates arbitration of "any dispute or controversy between the parties arising out of or relating to [the SLA]" which cannot be resolved by good faith negotiations, SLA, § 10.12, is the paradigm of a broad arbitration clause. *See Mehler v. Terminix Int'l Co.*, 205 F.3d 44, 49 (2d Cir.2000) (holding that a clause providing for arbitration of "any controversy or claim ... arising out of or relating to" the agreement is a "classically broad" arbitration clause); *Collins & Aikman*, 58 F.3d at 20 (holding that a clause "submitting to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause") (alterations in original). Thus, according to recent Second Circuit case law on the issue,[7] any claims which *relate to* the SLA are "presumptively arbitrable." *See Mehler*, 205 F.3d at 50; *see also Prudential Lines*, 704 F.2d at 64 ("a court should compel arbitration, and permit the arbitrator to decide whether the dispute falls within the [arbitration] clause, if the clause is 'broad' ").

Although Vermont Pure attempts to cast its claims under the PSA and not the SLA, it is clear that its claims are necessarily connected to the SLA such that they are covered by its arbitration clause. Even assuming that Vermont Pure's claims do not "arise out of" the SLA, this alone would not be sufficient to avoid application of the SLA's arbitration clause, since the term "relating to" has a much broader meaning than "arising out of." Furthermore, the Court is not bound by Vermont Pure's characterization of its legal claims, but instead must look to the factual allegations underlying those claims to determine whether they fall within the scope of the clause. *See Genesco*, 815 F.2d at 846 ("In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims 'touch matters' covered by the parties' sales agreements, then those claims must be arbitrated, whatever the legal labels attached to them.") (citations omitted).

The problems of which Vermont Pure complains stem from the allegedly inadequate performance of the Energy Suite system, which is made up, at least in part, of the software and hardware covered by the SLA. Even if Defendants' inadequate installation is in fact *one* of the causes of Vermont Pure's problems with the system, there can be little doubt that the performance of the Energy Suite system bears some connection to the software and hardware, and is thereby *related to* the SLA as

---

7. *Collins & Aikman* held that while claims arising under an agreement containing a broad arbitration clause are presumptively arbitrable, this presumption of arbitrability would not apply to claims that arose under an agreement that did not contain the arbitration clause. *See id.* at 20. *Mehler*, however, the more recent authority on this issue, did not limit the presumption of arbitrability in this way at all, but rather, extended the presumption of arbitrability to any claims that *related to* the contract containing the arbitration clause. *See Mehler*, 205 F.3d at 50.

well. Moreover, Vermont Pure admitted in the hearing that was held in this case that the original Energy Suite system was designed for the bakery business, and Defendants promised that they would revise it (under the terms of the PSA) to meet Vermont Pure's specific needs as a water and coffee supplier. Thus, Vermont Pure implicitly concedes that its problems stem in part from the software itself, since it is both the fact that the software was designed for the bakery business, *and* the fact of its alleged poor installation, that have made it perform inadequately for Vermont Pure's purposes. The Court will not allow Vermont Pure to avoid arbitration simply by casting their lawsuit as one under the PSA when in fact each of their claims touch matters covered by both contracts.[8]

Finally, it is significant that at least one of the counts in Vermont Pure's complaint explicitly relates to the SLA. In Count III, Vermont Pure seeks a declaratory judgment from the Court that it is not liable to the defendants for amounts demanded under both the PSA and the SLA. Vermont Pure's assertion that this count is simply seeking a set-off as a remedy for Defendants' breach of the PSA is to no avail. The claim under this count undeniably relates to the SLA for purposes of its arbitration clause.

Because the Court concludes that the arbitration clause in the SLA is sufficiently broad to cover all of Vermont Pure's claims against Defendants, it does not reach the issue of whether the PSA and the SLA are "inextricably intertwined" or a "unified contract" such that both the ordinary forum selection clause and the arbitration clause in the SLA would cover claims under either contract.

### IV. Conclusion

Wherefore, the Court **GRANTS** Defendants' motion to dismiss complaint for improper venue.

---

8. The Court also notes the practical difficulties involved in sorting out any damages that might have stemmed from the installation as opposed to the hardware and software itself, and the potential for dual recovery if any claims Vermont Pure might have because of the system under each contract were decided by two different tribunals.